FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ DEC 11 2018 ★

BROOKLYN OFFICE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| XCHANGE TELECOM LLC, | : |
| Plaintiff | : |
|  | : Civil Action No. 1:18-cv-6826-WFK-RER |
| v. | : |
|  | : |
| VELOCITY WIRELESS LLC, | : |
| Defendant. | : |
|  | : |

### MEMORANDUM OF LAW IN SUPPORT OF
### PLAINTIFF'S ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING
### ORDER AND A PRELIMINARY INJUNCTION

Frank G. Lamancusa
Joshua M. Bobeck *
Ross G. Slutsky
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: (202) 739-3000
Fax: (202) 739-3001
frank.lamancusa@morganlewis.com
joshua.bobeck@morganlewis.com
ross.slutsky@morganlewis.com

December 11, 2018

Dina R. Kaufman
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
Phone: (212) 309-6000
Fax: (212) 309-6001
dina.kaufman@morganlewis.com

*Counsel for Plaintiff Xchange
Telecom LLC*

* Petition for Admission to this Court filed November 15, 2018

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................... iii

I.    Preliminary Statement........................................................................................... 1

II.   Statement of Facts................................................................................................. 1

III.  Legal Standard ...................................................................................................... 5

IV.   Argument .............................................................................................................. 6

   A.    Xchange is Already Suffering Irreparable Harm .............................................. 6

     1.    Velocity's Harmful Interference Seriously Compromises Xchange's Business .......... 7

     2.    Velocity's Harmful Interference Has Seriously Damaged Xchange's Goodwill and Business Reputation .......................................................................................... 9

   B.    Xchange is Likely to Succeed on the Merits .................................................. 11

     1.    Violation of § 333 of the Communications Act ......................................... 12

     2.    Violation of FCC Rule § 90.1319.............................................................. 12

     3.    Tortious Interference with Contractual Relations ..................................... 13

     4.    Tortious Interference with Business Relations.......................................... 14

   C.    The Balance of Hardships Decidedly Favors Xchange ................................. 14

   D.    A TRO and Preliminary Injunction is in the Public Interest......................... 16

V.    Conclusion .......................................................................................................... 17

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bayit Care Corp. v. Tender Loving Care Health Care Servs. of Nassau Suffolk, LLC,*
  2012 WL 1079042 (E.D.N.Y. Mar. 30, 2012) ............................................................9

*Business Data Services in an Internet Protocol Environment*
  31 F.C.C.R. 4723 (2016)...........................................................................................13

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.,*
  547 F.3d 115 (2d Cir. 2008)......................................................................................18

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,*
  598 F. 3d 30 (2d Cir. 2010).......................................................................................15

*Matter of Defend H20 v. Town Bd. of the Town of E. Hampton,*
  147 F. Supp. 3d 80, 95 (E.D.N.Y. 2015) ...................................................................15

*G.K.A. Beverage Corp. v. Honickman,*
  55 F.3d 762 (2d Cir. 1995).......................................................................................17

*Galvin v. New York Racing Ass'n,*
  70 F. Supp. 2d 163 (E.D.N.Y. 1988) *aff'd sub nom. Galvin v. New York Racing Ass'n, Inc. (NYRA),* 166 F.3d 1200 (2d Cir. 1998)......................................11

*Jacobson & Company v. Armstrong Cork Co.,*
  548 F.2d 438 (2d Cir. 1977)................................................................................12, 13

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.,*
  296 F. Supp. 3d 442, 456-57 (E.D.N.Y. 2017), *aff'd,* 883 F.3d 32 (2d Cir. 2018) ...................................................................................................................10, 11

*Reuters Ltd. v. United Press Int'l,*
  903 F.2d 904 (2d Cir. 1990)......................................................................................14

*Rex Med. L.P. v. Angiotech Pharm. (US), Inc.,*
  754 F. Supp. 2d 616 (S.D.N.Y. 2010).......................................................................13

*Silber v. Barbara's Bakery, Inc.,*
  950 F. Supp. 2d 432 (2013) ...............................................................................9, 10, 11

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.,*
  190 F. Supp. 2d 577 (S.D.N.Y. 2002)..........................................................................9

*Ticor Title Ins. Co. v. Cohen,*
   173 F.3d 63 (2d Cir. 1999)...................................................................12

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
   60 F.3d 27 (2d. Cir. 1995).............................................................13, 14

*Winter v. Natural Resources Defense Council, Inc.,*
   555 U.S. 7 (2008)..................................................................................9

**Statutes**

47 U.S.C. § .................................................................................................16

**Federal Regulations**

47 C.F.R. § 90.1319(d) .........................................................................16, 20

47 C.F.R. §§ 90.1319.............................................................................16, 17

FED R. CIV. P. Rule 65 ............................................................................9, 10

**Administrative Decisions**

*Business Data Services in an Internet Protocol Environment*
   31 F.C.C.R. 4723 (2016).....................................................................13

*In re Wireless Operations in the 3650-3700 MHz Band,*
   22 F.C.C.R. 10421 (2007)...................................................................20

## I.    Preliminary Statement

Plaintiff Xchange Telecom LLC ("Xchange") seeks a Temporary Restraining Order ("TRO") and a preliminary injunction compelling Velocity Wireless LLC ("Velocity") to refrain from causing harmful interference to Xchange and its customers in conformance with federal law and the rules of the Federal Communications Commission ("FCC").

Plaintiff seeks this action from the Court because approximately 500 Xchange customers in Brooklyn are experiencing perpetual and material impairment of their broadband and telephony services that they receive from Xchange due to Velocity's interference.

Xchange is suffering irreparable harm on a daily basis since it cannot provide reliable connectivity to its customers on which those customers rely to conduct business, communicate, and access information. Beyond violating federal and state laws and FCC regulations, Velocity's persistent harmful interference and refusal to coordinate cooperatively its operations with Xchange deprives customers of the unfettered access to essential services for which they are paying.

## II.    Statement of Facts

Xchange provides broadband and telephony services in Brooklyn, New York using frequencies in the 3650-3750 ("3.65 GHz") band under FCC Call Sign WQOW965 and a nationwide authorization granted pursuant to Part 90 of the FCC's Rules.[1] As of August, 2017 Xchange had deployed approximately 300 radios connecting customers to Xchange's 3.65 GHz service. Lehmann Decl. ¶ 9. Beginning in August 2017, Xchange customers began experiencing

---

[1]    Lehmann Decl.¶ 5; *see* Radio Station Authorization of Xchange Telecom Corp., available at:
http://wireless2.fcc.gov/UlsApp/letterPdf/LetterPdfController?licId=3353963&letterVersionId=66&autoLetterId=0&letterCode=AZ&radioServiceCode=NN&op=LetterPdf&licSide=Y&letterTo=L%20%20%20&archive=null.

harmful interference to communications provided from several 3.65 GHz locations properly registered by Xchange. Lehmann Decl. ¶ 10. Subsequent investigations by Xchange and independent third-party engineers revealed that uncoordinated Velocity transmitters are the source of interference. In one instance, Xchange engineers found that harmful interference was coming from an uncoordinated Velocity transmitter located on the rooftop of 882 3rd Avenue in Brooklyn, and was mounted on a bracket owned and maintained by Xchange and using Xchange cabling without prior request or consent. Lehmann Decl. ¶ 12 and Exhibit B. While that particular offending equipment was subsequently removed, the harmful interference has continued. *Id.*

In December, 2017, Xchange retained an independent third-party engineering consulting firm who confirmed the interference. Lehmann Decl. ¶ 13. The Engineering Survey identified interference from transmitters Velocity operated at 132 Ditmas Avenue in Brooklyn (Call Sign WQRG207 at 40.38-08.0 N, 073-58-37.0 W). Lehmann Decl. ¶ 13.

On August 28, 2017, as part of a good faith effort at coordination, Xchange placed several phone calls to Velocity and spoke with Mr. Kpadeh Sepoe. Mr. Sepoe confirmed Velocity was transmitting at 132 Ditmas Avenue, Brooklyn, NY East / West in the 3.65 GHz spectrum using Baicells RF equipment. Lehmann Decl. ¶ 14. Xchange requested that Velocity turn off transmissions temporarily so that the companies could work together to find an acceptable solution. Velocity was explicitly informed that its interference in the 3.65 GHz band was adversely impacting hundreds of Xchange customers. After multiple unsuccessful attempts to contact Velocity, Mr. Sepoe, when finally reached, informed Xchange that he was unwilling to turn off Velocity's transmissions, even temporarily, to permit frequency coordination. Lehmann Decl. ¶ 14.

Xchange, on August 30, 2017 and again on September 8, 2017, notified Mr. Sepoe in writing that Velocity's operations in the 3.65 GHz band was interfering in Xchange's use of that spectrum and was resulting in harmful interference to Xchange's services provided to its customers. Lehmann Decl. ¶ 15 & Ex. D. Xchange has made repeated attempts to contact Mr. Sepoe or someone else at Velocity to engage in mutual coordination with no response from Velocity.

Currently, due to Velocity's harmful interference, the number of Xchange's 3.65 GHz antennas in service has dwindled from approximately 300 to below 80 (sometimes there are multiple customers on a single radio). Lehmann Decl. ¶¶ 9, 20. In some instances, the radio disconnections are a product of customer losses incurred by interference. Xchange originally served 770 lines for 500 customers using its 3.65 GHz network. Lehmann Decl. ¶ 18. In other instances, the disconnections reflect efforts Xchange has made to migrate some of its 3.65 GHz customers to new equipment that operates in either the 5.1 GHz, 5.8 GHz, or 70/80/90 GHz bands. Lehmann Decl. ¶ 20. That migration, however, comes at considerable cost due to capital investment in new transmission equipment, installation costs and the costs associated with troubleshooting the 3.65 GHz installations and dealing with unsatisfied customers.

Service in these spectrum bands, however is not a complete substitute because of the different propagation characteristics. Since it utilizes a relatively low frequency, 3.65 GHz service has sufficient signal penetration to enable point to multipoint operations. Lehmann Decl. ¶ 21. In contrast, services in the 5.1 and 5.8 GHz bands must be point-to-point with a direct line of sight between the base station and the antenna. This limitation on range fundamentally alters the underlying distribution model, precluding Xchange from using omnidirectional operations

and forcing its reliance on fixed links. This loss of range forecloses Xchange's ability to reach certain customers. Lehmann Decl. ¶ 21.

Xchange's customers have lost access to the data and telephony services they pay for and rely on for their primary voice line and internet access. Specifically, Xchange's business and residential customers had unfettered access to reliable data and telephony services which enabled them to conduct business, communicate, and access information. Lehmann Decl. ¶ 19. Velocity's harmful interference is unacceptable and in some instances dangerous – Xchange's business customers include medical facilities, nursing homes, doctors, and providers of emergency services. *Id.*

Velocity has interfered with all forms of Xchange's 3.65 GHz service irrespective of the bandwidth Xchange has committed to provide the customer. Lehmann Decl. ¶ 18. This means that broadband customers experience significant delays in reaching the Internet and frequently their Internet access is blocked entirely. *Id.* The same harms have accrued in the calling context – voice customers utilizing Xchange's interconnected VoIP service have experienced "dropped calls, significant static on the line, and loss of one-way audio, caller ID, call waiting, and other call features due to interference-induced packet loss." Lehmann Decl. ¶ 19. As a result of this interference, Xchange has lost approximately 370 customers representing approximately $30,000 in monthly recurring charges. Lehmann Decl. ¶ 17. The number of lost business opportunities is incalculable.

Furthermore, migration imposes significant costs upon Xchange. All of the aforementioned alternative bands operate in higher frequencies than 3.65 GHz and accordingly have less favorable signal propagation characteristics. Lehmann Decl. ¶ 21. Since higher frequency signals cannot travel as far, Xchange is left footing the bill to pay for new antenna

equipment and migrating customers to a point-to-point (as opposed to point to multipoint) infrastructure that must rely on links within line of sight of each other (and thereby frequently imposing other real estate costs in the process). Migration typically imposes a cost of over $1000 per customer in equipment and labor costs. Lehmann Decl. ¶ 20.

Xchange has made good faith efforts to reach out to Velocity in the hopes of finding a mutually agreeable solution, but these efforts have been to no avail. At this time there are no other avenues for persuading Velocity to cooperate and coordinate use of the 3.65 GHz spectrum as a required by the FCC's rules.

### III.    Legal Standard

Xchange recognizes that its request for a temporary restraining order ("TRO") and a preliminary injunction seeks "an extraordinary and drastic remedy ... never awarded as of right." *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 438 (E.D.N.Y. 2013) *quoting Munaf v. Geren*, 553 U.S. 674, 689–90, (2008). As explained below such extraordinary relief is warranted here.

In this Court, a movant may obtain a TRO and preliminary injunctive relief under Fed. R. Civ. P. Rule 65 where it demonstrates "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success of the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction" *Silber*, 950 F. Supp. 2d at 438-39 *quoting Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, 468 F. App'x 43, 45 (2d Cir. 2012); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Second Circuit standard for granting a TRO and a preliminary injunction is the same. *Bayit Care Corp. v. Tender Loving Care Health Care Servs. of Nassau Suffolk, LLC*, No. 11-cv-3929 DRH, 2012 WL 1079042, at *1 (E.D.N.Y. Mar. 30, 2012); *Spencer Trask Software & Info. Servs., LLC v.*

*RPost Int'l, Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002) ("The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical.")

Because Xchange seeks a mandatory TRO and injunction that requires Defendant Velocity to cease its operations in the 3.65 GHz spectrum in Brooklyn and to mandate coordination with Xchange, Plaintiff Xchange's request for a TRO and a preliminary injunction is subject to a heightened standard. *See N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 456-57 (E.D.N.Y. 2017), *aff'd*, 883 F.3d 32, (2d Cir. 2018) citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015), *cert. dismissed sub nom. Allergan PLC v. New York ex. rel. Schneiderman*, 136 S. Ct. 581 (2015). Under this heightened standard, the Court may grant Xchange a TRO and mandatory injunction "only upon a clear showing that [it] is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *See N. Am. Soccer League*, 296 F. Supp. 3d at 456 *citing Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d. Cir. 1995).

As explained below, Xchange makes the required "clear showing" satisfying all elements of the standard, and thus a TRO and preliminary injunction are warranted.

## IV.   Argument

### A.   Xchange is Already Suffering Irreparable Harm

Irreparable harm is "the single most important prerequisite" before the Court can issue a TRO or a preliminary injunction, requiring Xchange to show such injury is "likely" before the other elements may be considered. *See N. Am. Soccer League, LLC*, 296 F. Supp. 3d at 457 citing *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted); *see also Silber*, 950 F. Supp. 2d at 439 ("irreparable injury, is the 'single most

important prerequisite.'" *quoting Singas*, 468 F. App'x at 45). Xchange may prove irreparable

harm by demonstrating that absent a TRO or "preliminary injunction they will suffer an injury

that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied

if a court waits until the end of trial to resolve the harm." *Id*. Irreparable harm also means harms

"for which a monetary award cannot be adequate compensation." *Silber*, 950 F. Supp. 2d at 439

*quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979). Further,

Courts have found "irreparable harm where a party is threatened with the loss of a business,"

including when the "very viability' of the business is at risk." *N. Am. Soccer League, LLC*, 296

F. Supp. 3d at 457 *citing Tom Doherty*, 60 F.3d at 37–38.

### 1. Velocity's Harmful Interference Seriously Compromises Xchange's Business

Xchange clearly satisfies the standard for showing "actual and imminent" irreparable

harm because it is already suffering injury "that is neither remote nor speculative." A monetary

award cannot bring back the approximately 370 3.65 GHz customers that Xchange has lost in

Brooklyn as a direct result of Velocity's harmful interference and refusal to coordinate. Lehmann

Decl. ¶ 17. Xchange's injury is not a mere abstract possibility – Velocity's persistent interference

has already cost Xchange hundreds of customers, damaged its business reputation and goodwill

and its ability to attract prospective customers. *Id*. Given Velocity's outright refusal to coordinate

thus far, Xchange does not anticipate any relief absent a grant of an injunction and a TRO.

Xchange's 3.65 GHz network is a substantial part of its business, one that is of vital

importance to its ability to survive as an independent communications company that is not

subservient to the dominant telecommunications carrier in the region – Verizon. Lehmann Decl.

¶ 5. The damage that Velocity's interference has had on Xchange's business has seriously

compromised Xchange's ability to continue serving customers in Brooklyn. Lehmann Decl. ¶ 17.

This clearly satisfies the heightened standard required to establish irreparable harm. *See Galvin v. New York Racing Ass'n*, 70 F. Supp. 2d 163, 170 (E.D.N.Y. 1988) *aff'd sub nom. Galvin v. New York Racing Ass'n, Inc. (NYRA)*, 166 F.3d 1200 (2d Cir. 1998) ("loss of business need not be total, so long as it is so great as to seriously compromise the company's ability to continue.").

Precedent supports Xchange's claim of irreparable harm to its business. In the Second Circuit, irreparable harm exists where, absent injunctive relief, the movant would likely lose a customer relationship that would otherwise have produced "an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68-69 (2d Cir. 1999) (injunctive relief warranted where it would be "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."). Irreparable harm, for example, exists where there is "risk that a company's customers would turn to competitors who stocked a market-dominating product" thereby creating a potential injury which could not be rectified by money damages. *See Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 444–45 (2d Cir. 1977).

Xchange's predicament is analogous (though not directly since Velocity and Xchange have no contractual relationship) to those of distributors facing termination by their long term suppliers. For example, in *Jacobson & Co. v. Armstrong Cork. Co.*, the Second Circuit affirmed an injunction issued by the Southern District of New York in part because the movant, a distributor of flooring, faced the prospect that the loss of the relationship with the supplier jeopardized the distributors' "good will and create[d] a risk of 'immeasurable harm' should [the distributor's] customers and potential customers turn to competitors who do sell [the supplier's] products. 416 F. Supp. 564, 570 (S.D.N.Y. 1976). The trial court also concluded that the

distributor would face a "competitive disadvantage" were it unable to offer the supplier's products and such loss was "neither calculable nor compensable in dollars and cents." *Id.*

Velocity's harmful interference places Xchange in a similar position. Without access to its 3.65 GHz network Xchange is unable to serve existing or potential customers who desire the advantages of broadband services offered through the use of 3.65 GHz fixed wireless service. Lehmann Decl. ¶ 17. Xchange's customers already have turned to its wireline and cable network-based competitors thus placing Xchange at a serious competitive disadvantage without the ability to offer its customers a service over its own network. *Id.* And Xchange does not have the ability to simply deploy its own fiber or coaxial cable network. The FCC has found that competitive carriers such as Xchange face significant barriers that "deter rapid competitive entry" and impede such companies from deploying their own networks. *See e.g., In re Bus. Data Servs. in an Internet Protocol Env't*, 31 F.C.C. Rcd. 4723, 4822 ¶ 224 (2016). Xchange's past and future losses, including potential lost business opportunities are incalculable. Lehmann Decl. ¶ 17.

**2.    Velocity's Harmful Interference Has Seriously
         Damaged Xchange's Goodwill and Business Reputation**

In addition to lost customers, Xchange has lost significant and numerous business opportunities to expand its 3.65 GHz fixed wireless service in Brooklyn. Lehmann Decl. ¶ 17. The Second Circuit has long recognized that "a loss of prospective goodwill can constitute irreparable harm." *Tom Doherty*, 60 F.3d at 38 (2d Cir. 1995). *See also Jacobson*, 548 F.2d at 445 (affirming finding of irreparable harm where movant "presented ample evidence to show a threatened loss of good will and customers, both present and potential"). Indeed, as the Southern District of New York has found, "courts have found irreparable harm from a loss of goodwill or business relationships ... where the dispute between the parties leaves one party unable to

provide its product to its customers." *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010).

Applicable precedent in this circuit supports issuance of a TRO and an injunction here. For instance, in *Tom Doherty*, the Second Circuit recognized that movant, a publisher of children's books, had demonstrated irreparable injury that a breach of contract by the owner of the rights to the Power Rangers characters would deprive the publisher an opportunity to increase its goodwill and business reputation to attract other similarly situated creators. 60 F.3d at 39. Here, Velocity's harmful interference is similarly depriving Xchange of the ability to demonstrate the viability and value of its 3.65 GHz services to potential customers. The value of such good will is beyond calculation and cannot be addressed through monetary damages and thus supports Xchange's claim of irreparable harm.

A TRO and/or preliminary injunction is also warranted here because Velocity's harmful interference deprives Xchange of an ability to provide customers a unique product, its 3.65 GHz service. In *Reuters Ltd. v. United Press International*, 903 F.2d 904 (2d Cir. 1990), the Second Circuit reversed the district court's denial of a preliminary injunction, finding that United Press ("UPI") demonstrated irreparable harm because, if Reuters could terminate its agreement with UPI, then UPI would be deprived of the ability to continue providing its product — foreign news photographs supplied by Reuters — to UPI's customers and unable to continue supplying foreign news photographs (provided to it by Reuters) to its customers. *Id*. at 908-09. The Second Circuit held that UPI had established that the inability to provide such news photographs would harm UPI's reputation and cause a loss of goodwill, and that such injuries are "nearly impossible to value." *Id*. at 908.

-10-

Xchange's service here is likewise unique; as Mr. Lehmann explains, other fixed wireless services are not a substitute because their propagation characteristics render it unsuitable for service in some locations and have more limited range. Thus the loss of its 3.65 GHz network deprives Xchange of the ability to reach a broad swath of potential customers. Lehmann Decl. ¶ 21.

Xchange is clearly unable to provide its 3.65 GHz service to its customers, meeting the irreparable harm standard. Xchange has thus demonstrated the existence of ongoing, irreparable injury to its business, its goodwill and its business relationships with existing and prospective customers. The injury Xchange is enduring due to Velocity's harmful interference cannot be remedied by monetary damages alone. Granting an injunction is the only way to stem the irreparable harm Xchange and its customers have already suffered and to prevent any further harm from occurring.

### B.    Xchange is Likely to Succeed on the Merits

The Second Circuit has adopted a somewhat more flexible standard than "likely to succeed on the merits"— that a movant requesting a TRO or preliminary injunction must either show "(1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *In re Defend H20 v. Town Bd. of the Town of E. Hampton*, 147 F. Supp. 3d 80, 95 (E.D.N.Y. 2015) *citing Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F. 3d 30, 35 (2d Cir. 2010). This standard permits the Court "to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *VCG Special*

*Opportunities Master Fund Ltd.*, 598 F.3d at 35. Xchange meets both standards, as it is substantially likely to succeed on its claims for relief. These claims are as follows:

### 1.    Violation of § 333 of the Communications Act

Section 333 of the Communications Act provides that "[n]o person shall willfully or maliciously interfere with or cause interference to any radio communications of any station licensed or authorized by or under this chapter or operated by the United States Government." Since August 2017, however, through the use of uncoordinated transmitters operating in the 3.65 GHz band at multiple locations in Brooklyn, Velocity has caused harmful interference to Xchange and its customers. Velocity has continued to do so despite being informed by Xchange of the harmful interference caused to its customers. Velocity's persistent creation of harmful interference through operation of uncoordinated transmissions amounts to a willful, unequivocal, continuing violation of Section 333. 47 U.S.C. § 333.

### 2.    Violation of FCC Rule § 90.1319

Under Section 90.1319 of the FCC's rules, all 3.65 GHz applicants and licensees must "cooperate in the selection and use of frequencies in the 3650-3700 MHz band in order to minimize the potential for interference and make the most effective use of the authorized facilities." 47 C.F.R. § 90.1319(d). Such licensees must "make every effort to ensure that their fixed and base stations operate at a location, and with technical parameters, that will minimize the potential to cause and receive interference." *Id.* Importantly, the Commission requires that "[l]icensees of stations suffering or causing harmful interference are expected to cooperate and resolve this problem by mutually satisfactory arrangements." *Id.* Velocity has ignored Xchange's repeated requests for coordination, has not complied with its obligations, and continues to interfere harmfully with Xchange's operations.

Xchange has, in good faith, repeatedly reached out to Velocity to coordinate and find a mutually acceptable solution to no avail. Despite Xchange's good faith efforts at cooperation, Velocity proved difficult to reach and obstinate on the issue of coordination. Velocity flat out refused to turn down transmissions even temporarily, and in doing so, foreclosed any possibility of viable coordination with Xchange. Velocity's uncooperative posture amounts to an abdication of its responsibilities under FCC rules, and is inconsistent with its obligations under Section 90.1319. 47 C.F.R. § 90.1319.

### 3. Tortious Interference with Contractual Relations

Under New York law, the tort of intentional interference with contractual relations has four elements: (1) existence of a valid contract; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of the breach of that contract; and (4) damages caused by the breach. *G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 767 (2d Cir. 1995). Velocity's conduct plainly satisfies all four elements. The first two elements are satisfied because, through Xchange's repeated communications with Velocity (through phone calls, the September 8, 2017 email, and the August 30, 2017 cease and desist letter), Velocity had knowledge of the fact that Xchange actively provided communications service using the 3.65 GHz spectrum under terms of service contracts with its customers. As a fellow communications enterprise, Velocity was aware of the fact that its willful refusal to coordinate and its continued creation of harmful interference would breach the terms of such contracts by unacceptably degrading service. Finally, as a result of Velocity's deliberate refusal to coordinate, Xchange customers have experienced damage in various forms of degraded service, and Xchange has suffered harms, including irreparable damage to its business reputation and goodwill, and financial harms from loss of customers and efforts to repair or work around Velocity's interference. All of Xchange's 3.65 GHz customers in Brooklyn (approximately 770 lines/500 customers) have been adversely impacted in the form of

-13-

lost internet connectivity, blocked telephone calls and static on voice calls. As a result of this degradation of service, Xchange has lost approximately 370 customers representing approximately $30,000 in monthly recurring charges.

### 4.     Tortious Interference with Business Relations

Under New York Law, tortious interference with business relations has four elements: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship. *Catskill Dev., L.L.C. v. Park Place Entm't Corp.,* 547 F.3d 115, 132 (2d Cir. 2008). As was explained above, Xchange has business relations with all of its 3.65 GHz customers in Brooklyn as well as prospective customers that Xchange could serve using its 3.65 GHz system. By operating on the same frequency as Xchange, and without coordinating use of that spectrum, Velocity has been interfering and continues to interfere with Xchange's business relations with both current and prospective customers. The Defendant has acted in defiance of an explicit federal regulatory duty to coordinate. This refusal to coordinate, and the resulting interference has injured Xchange's business relations with its 3.65 GHz customers in Brooklyn, resulting in a loss of approximately 370 customers.

### C.     The Balance of Hardships Decidedly Favors Xchange

Xchange and its customers in Brooklyn suffer irreparable harm every day that Velocity's interference prevents Xchange's ability to deliver reliable communications services to its customers. Degradation of service due to Velocity's uncoordinated transmissions has been a persistent issue for Xchange for the past fourteen months.

Velocity may claim that temporarily powering down its 3.65 GHz transmissions in order to coordinate with Plaintiff would be harmful to its own customers. Temporarily powering down

-14-

Velocity's 3.65 GHz transmissions for a specific window during a time of low usage to coordinate Velocity's and Xchange's spectrum usage as required by the FCC's rules, however would, at most, amount to a temporary disruption of service that would provide the long term mutual benefit of both Xchange and Velocity operating in the 3.65 GHz band in a manner in which neither party subjects the other to harmful interference. In light of the persistent and severe degradation of service Xchange has suffered for the past 14 months, a brief power down for purposes of coordination would be a comparatively minor inconvenience.

Moreover, the equities favor rewarding those who have made good faith efforts to comply with the law. Xchange has been duly authorized by the FCC to operate in the 3.65 GHz band. After learning of the interference issue in Brooklyn, Xchange expended considerable time and money (in both time spent and payments to a third party engineering firm) to isolate and identify the source of interference. Cognizant of its frequency coordination and interference mitigation obligations under federal communications laws and regulations, Xchange repeatedly reached out to Velocity in pursuit of a cooperative arrangement but was met with resistance or silence.

On the other hand, Velocity has exhibited an apparent disregard for its legal and regulatory obligations. Velocity has deliberately availed itself of the benefits of operating in the 3.65 GHz band but has been flouting some of the most basic corresponding responsibilities. While Velocity might consider coordinating with other users of the 3.65 GHz band inconvenient, what the company does not appear to appreciate is that coordination is a requirement rather than an optional measure.

Granting an injunction would reward Xchange for its good faith efforts at compliance. Denying an injunction would have the effect of rewarding Velocity for its disregard of the rule of law.

**D.     A TRO and Preliminary Injunction is in the Public Interest**

The public interest weighs heavily in favor of granting Xchange the TRO and preliminary injunction it seeks here. Velocity is effectively undermining the FCC's applicable regulatory regime in the 3.65 GHz band. There is no set of facts and no circumstances in which allowing persistent violation of the FCC's frequency coordination rules is in the public interest. Federal requirements unequivocally state that all 3.65 GHz band applicants and licensees must "cooperate in the selection and use of frequencies in the 3650-3700 MHz band in order to minimize the potential for interference and make the most effective use of the authorized facilities." 47 C.F.R. § 90.1319(d).

In opening up the 3.65 GHz spectrum for use in providing broadband service, the FCC found that the public interest was best served by a system of non-exclusive use. *In re Wireless Operations in the 3650-3700 MHz Band*, Memorandum Opinion and Order, 22 FCC Rcd. 10421, 10426 ¶ 16 (2007). The FCC elected this system in order to facilitate rapid entry into the market by multiple broadband providers "at low entry costs and with minimal regulatory delay." *Id*. at 10425 ¶ 13. The FCC's design of the 3.65 GHz regime, however, recognized that "the use of a non-exclusive licensing approach must be accompanied with the means to ensure that multiple users can operate successfully in the band." *Id*. at 10429 ¶ 21. The FCC found that the public interest would best be served where "[p]roviders will not be permitted simply to turn up their transmitters and overwhelm others in the area; instead, they will be required to reach a reasonable accommodation with the other operators nearby." *Id*. ¶ 22.

In short, there is considerable public interest in assuring law-abiding spectrum users and their underlying investors that everyone must honor applicable coordination obligations. It is for that reason that the FCC mandated that 3.65 GHz licensees "make *every effort* to ensure that their ... stations operate ... with technical parameters, that will minimize the potential to cause and receive interference." 47 C.F.R. § 90.1319(d) (emphasis added). Thus, the public interest definitively supports issuance of the TRO and injunction Plaintiff seeks.

## V.    Conclusion

For all of the foregoing reasons, Xchange respectfully requests that the Court grant Xchange's motion for a TRO and preliminary injunction.

Respectfully submitted this 11th day of December, 2018.

/s/ Dina R. Kaufman

Frank G. Lamancusa                          Dina R. Kaufman
Joshua M. Bobeck *                          MORGAN, LEWIS & BOCKIUS LLP
Ross G. Slutsky                             101 Park Avenue
MORGAN, LEWIS & BOCKIUS LLP                 New York, NY 10178-0060
1111 Pennsylvania Avenue, NW                Phone: (212) 309-6000
Washington, DC 20004                        Fax: (212) 309-6001
Phone: (202) 739-3000                       dina.kaufman@morganlewis.com
Fax: (202) 739-3001
frank.lamancusa@morganlewis.com
joshua.bobeck@morganlewis.com
ross.slutsky@morganlewis.com

*Counsel for Plaintiff Xchange Telecom LLC*

* Petition for Admission to this Court filed November 15, 2018.